IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Newport News Division

DINA LYNETTE HARRIS,  :
                      :
        Plaintiff,    :
                      :
v.                    :          Action No. 2:14-CV-518
                      :
CAROLYN W. COLVIN,    :
Acting Commissioner,  :
Social Security Administration, :
                      :
        Defendant.    :
                      :

## REPORT AND RECOMMENDATION

Plaintiff Dina Lynette Harris ("Ms. Harris"), proceeding *pro se*, filed a complaint pursuant to 42 U.S.C. § 405(g) seeking judicial review of the final decision of the Defendant, the Acting Commissioner of the Social Security Administration ("Acting Commissioner" or "Defendant"), which denied Ms. Harris' claim for Disability Insurance Benefits ("DIB") pursuant to Title II, and her claim for Supplemental Social Security Income ("SSI") pursuant to Title XVI of the Social Security Act. Both parties filed motions for summary judgment. ECF Nos. 14 and 15.

This action was referred to the undersigned United States Magistrate Judge by order from the United States District Judge, *see* ECF No. 9, pursuant to 28 U.S.C. §§ 636(b)(1)(B)-(C), Federal Rule of Civil Procedure 72(b), Local Civil Rule 72, and the April 2, 2002, Standing Order on Assignment of Certain Matters to United States Magistrate Judges. After reviewing the briefs, the undersigned disposes of the cross motions for summary judgment without a hearing

pursuant to Federal Rule of Civil Procedure 78(b) and Local Civil Rule 7(J). For the following reasons, the undersigned **RECOMMENDS** that Ms. Harris' motion for summary judgment, ECF No. 14, be **DENIED**; the Defendant's motion for summary judgment, ECF No. 15, be **GRANTED**; and the final decision of the Acting Commissioner be **AFFIRMED**, and that this matter be **DISMISSED WITH PREJUDICE**.

## I. PROCEDURAL BACKGROUND

Ms. Harris filed applications for DIB and SSI on August 3, 2011, originally alleging a disability onset date of March 1, 2008, due to severe tendonitis in the right foot. R. 56.[1] These applications were initially denied on December 15, 2011, R. 95, 100, and denied again upon reconsideration on August 10, 2012, R. 110, 114. Ms. Harris requested a hearing in front of an administrative law judge ("ALJ") on August 29, 2012, R. 118. The hearing occurred on August 8, 2013. R. 34. The ALJ issued his decision on August 14, 2013, denying Ms. Harris' applications. R. 23. The Appeals Council for the Office of Disability and Adjudication ("Appeals Council") denied Ms. Harris' request for review of the ALJ's decision on September 23, 2014. R. 23. After exhausting her administrative remedies, Ms. Harris, acting *pro se*, filed her complaint for judicial review of the Acting Commissioner's final decision on October 17, 2014. ECF No. 3. The Acting Commissioner filed an answer on December 23, 2014. ECF No. 7. Both parties filed motions for summary judgment, ECF Nos. 14 and 15, and the matter is now ripe for recommended adjudication.

## II. RELEVANT FACTUAL BACKGROUND

In her applications, filed on August 3, 2011, Ms. Harris alleged a disability onset date of March 1, 2008. R. 144, 148. At the time of the ALJ's decision, Ms. Harris was 42, graduated

---

[1] "R." refers to the certified administrative record, ECF No. 8, that was filed under seal on December 23, 2014 pursuant to Local Civil Rule 5(b) and 7(C)(1).

from high school, and had worked as a cook at a number of locations. R. 38, 267. At the hearing held on August 8, 2013, Ms. Harris supplemented her medical records by providing additional information via testimony. The record included the following factual background for the ALJ to review:

Ms. Harris resides in Franklin, Virginia with her thirteen-year-old son. R. 38. She has trouble completing tasks around the house, as both standing and sitting are difficult. R. 43. She can sit for about an hour before needing to change positions and can only stand for about thirty minutes. R. 45. Ms. Harris' house is two floors but she tends to live downstairs because going upstairs is difficult. R. 45. Her son helps her around the house and sometimes her aunt helps out. R. 38, 44. She cooks fifteen-minute meals due to her inability to stand for a long time and she washes the dishes as well. R. 45, 46. She also tries to do the laundry but her son carries it downstairs and she only lifts about a ten-pound load. R. 45. Walking is too unbearable that Ms. Harris uses a mechanical cart to maneuver around the grocery store. R. 46.

Most of Ms. Harris' employment history involves serving as staff in a kitchen, standing most of the time. R. 43. She also stated, "Sitting is a job," and that she would not be able to do jobs that require either sitting or standing. R. 43. Ms. Harris experiences constant pain in the right heel area and has seen various doctors and physical therapists to address the issue. R. 40, 271. Sometimes the pain travels up her leg as far as her knee. R. 44. She takes Hydrocodone for the pain every six hours. R. 43-44. She also takes over-the-counter medicine as well to help her sleep because of the pain. R. 44. However, the medicine she takes during the day also makes her sleep for about five hours during the day, taking two separate naps a day. R. 51.

Before her second foot surgery in March of 2013, Ms. Harris elevated her legs every three or four hours. R. 48. However, after the second surgery and presently, Ms. Harris elevates

3

her legs in a recliner every hour and a half for about thirty minutes between nine o'clock in the morning and five o'clock in the evening. R. 46-48, 50-51. She also has problems sleeping through the night because she is "up constantly in pain." R. 51.

Ms. Harris showed up to the hearing using her cane and testified that she uses it all the time. R. 38-39. After her first foot surgery in May of 2012, Ms. Harris used her cane only in the home and then in December of 2012 she started using it both inside and outside of the home. R. 39.

Due to her bills "piling up," Ms. Harris worked about 25-30 hours per week from September of 2010 until May of 2011 as a cook. R. 41, 42. While at this job she was on her feet all day and was not given any breaks. R. 42. She lifted and carried anywhere between 25 and 50 pounds of heavy grease jugs. R. 42. Now she can lift only about fifteen pounds. R. 45. She stopped working because "it was unbearable [and] the boss didn't like the fact that [she] had to always go to the doctor and . . . need[ed] the [sic] days off." R. 42-43. She has not worked since leaving this job. R. 43.

Ms. Harris' medical records indicate that she is 5'5", about 230 pounds, has a history of diabetes, and is frequent smoker. R. 349, 385. She first sought advice at 1Foot 2Foot Centre for Foot and Ankle Care regarding her right heel on April 21, 2008. R. 276. At the appointment, she described the pain as "aching, throbbing, and dull in nature." R. 276. An X-ray examination revealed an infracalcaneal spur, anterior advancement of cyma line, and plantar fasciitis. R. 276. Dr. Matthew C. Dairman, DP, FACFAS performed a steroid cocktail injection and instructed Ms. Harris on stretching exercises and proper supportive footwear. R. 276. She was placed in a boot in May of 2011 and wore it both sitting and during weight-bearing activities during the daytime hours. R. 287. On August 18, 2011, Ms. Harris sought treatment at Physical Therapy Works. R.

4

281.  At the appointment, Ms. Harris indicated that she had "shooting pain in right [sic] foot up to [her] knee." R. 290. After her initial physical therapy evaluation, she was instructed to follow up with Dr. Jesse Anderson, DPM three times a week for three weeks. R. 287.

Ms. Harris sought treatment and rehabilitation at Physical Therapy Works regularly for about three weeks and then returned again at the end of October to continue treatment until early 2012 due to an increase in pain. R. 293-294, 301. On her progress report, it was noted that physical therapy was to continue until Ms. Harris improved ambulating and balancing with the right foot. R. 295. On August 26, 2011, she indicated that she awoke every hour the previous night due to pain in the right foot. R. 295. Ms. Harris returned to Physical Therapy Works on February 16, 2012 to improve ambulation.

On April 15, 2012 Ms. Harris had an initial evaluation at the Chesapeake Foot & Ankle Center. R. 378. Dr. William S. Wooddell, DPM ("Dr. Wooddell") noted, "There is significant tenderness on palpation of the plantar medial heel at the attachment of the plantar fascia. There is also pain noted on palpation along the medial band of the plantar fascia." R. 378. X-rays showed a large calcaneal spur bilaterally. R. 378. Dr. Wooddell recorded that the only treatment option viable was a surgical plantar fasciotomy to which Ms. Harris agreed. R. 378.

On May 4, 2012, Ms. Harris had a plantar fasciotomy of the right foot at Chesapeake General Hospital. R. 376. Dr. Wooddell performed the surgery, placing a two centimeter incision on the plantar calcaneal tuberosity and releasing fibrous adhesions along the medial two-thirds of the plantar facial band. R. 376. She continued to attend physical therapy after her surgery; however, in her June, 2012 Physical Therapy Works' progress report, it was noted, "Ms. Harris attended 4 of the 12 prescribed Physical Therapy sessions per this prescription due to vacation." R. 398. On July 19, 2012, Ms. Harris followed up at the Chesapeake Foot & Ankle

Center. R. 379. Due to her complaints of continued pain on the bottom of her heel since her surgery, Dr. Wooddell placed her on a 12-day Prednisone dose, renewed her pain prescription for Vicodin #25, and referred her back to physical therapy. R. 379.

On July 28, 2012, Dr. Matthew Sleziak, D.O. ("Dr. Sleziak") examined Ms. Harris and produced a consultative examination report for the Disability Determination Services. R. 354. At the examination, Ms. Harris reported a history of right foot tendonitis and plantar fasciitis, characterizing her issue as "chronic sharp shooting pain in her right foot and heel that radiates up her leg and numbness and tingling in her right leg that is exacerbated by standing and walking." R. 349. Ms. Harris also attended with an assistive device but could walk around the exam room without it but did appear to benefit from it as she had a "limping gait." R. 351. At the examination, Ms. Harris was able to rise from a sitting position and had no difficulty getting on and off the exam table. R. 352. She was able to walk on her heels with difficulty and was able to walk on her toes with moderate difficulty. R. 352. She was unable to achieve tandem walking and could not hop on the right foot. R. 352. Dr. Sleziak reported in his impression of Ms. Harris that she "can be expected to sit and stand normally in an 8 hour workday with normal breaks" and "can be expected to walk at least 30 minutes at a time in an eight hour work day before requiring a break due to right foot pain." R. 353. As for lifting, Dr. Sleziak stated that she should be able to carry at least 20 pounds frequently and 40 pounds occasionally. R. 353. Further he reported, "There are no limitations on bending, stooping, crouching, squatting . . . reaching, handling, feeling, grasping, [and] fingering." R. 353.

On August 30, 2012 and September 10, 2012, Ms. Harris reported to Dr. Wooddell there was some improvement, but overall her heel was still painful. R. 380. On October 10, 2012, despite her physical therapy, the pain still existed. R. 380. Dr. Wooddell prescribed a topical

pain cream and sent her to have an MRI to rule out the possibility of a calcaneal stress fracture or potential nerve entrapment. R. 380. The MRI results showed a "subchondral cyst with loss of overlying articular cartilage[, and] . . . [n]o fractures." R. 401. Ms. Harris discussed her MRI results with Dr. Wooddell on October 24, 2012. R. 381. He noted scar tissue around the area of surgery as well as "some tendinopathy of the posterior tibialis tendon but on the palpation today this does not seem to be the area that is concerning." R. 381. Dr. Wooddell injected a cocktail of medicine for pain management, instructed her to continue to use the topical pain cream, and to continue physical therapy. R. 381. Ms. Harris followed up again on November 28, 2012 and reported that her condition "has gotten slightly better since her last visit." R. 381. Dr. Wooddell provided another injection into the plantar lateral heel with a cocktail of pain medication. R. 381. He recorded that she complained of significant pain at night and prescribed one refill of Vicodin #25. R. 381. During this time, Ms. Harris continued to attend physical therapy appointments at Physical Therapy Works. R. 390-92. Her treatment program included: "Physical Therapy Evaluation, Therapeutic Exercise, Therapeutic Activity, Neuromuscular Re-education, Gait Training, Strengthening, Stretching, Home Exercise Program Instruction, Desensitization Manual Therapy, Modalities PRN (Hot Pack, Cold Pack, Ultrasound, E-stim, Iontophoresis), Aquatics as needed." R. 392. In her January progress report, physical therapist Brittany Rogers, DPT noted, "Ms. Harris reports 50% improvement in condition since the re-initiation of Physical Therapy." R. 390.

On February 20, 2013, Ms. Harris still had significant pain; thus, Dr. Wooddell scheduled her for a follow-up surgery to remove scar tissue and conduct another plantar fascial release. R. 381. On March 29, 2013, Ms. Harris had another plantar fasciotomy of the right foot at the Chesapeake General Hospital. R. 369. Dr. Wooddell placed an incision across the plantar aspect

of the heel and released fibrous adhesions, medially and laterally, along the way. R. 369. After her second surgery, Ms. Harris continued to follow up with Dr. Wooddell and attend physical therapy. R. 383. Around this time, Ms. Harris reported to physical therapy that she "continues to have pain first thing in the morning and when she goes to bed at night." R. 387. She stated that she walks with her foot turned inward to relieve the pressure in her heel. R. 387. On May 22, 2013, physical therapist, Dr. Rogers, reported that Ms. Harris "ambulated into Therapy without a Single Point Cane and with flat, unsupportive slip-on shoes." R. 387.

On June 12, 2013, Ms. Harris followed up with Dr. Wooddell, who prescribed more Vicodin to manage the pain and noted that she was "about 30% better than she was right after surgery." R. 383. On August 2, 2013, Ms. Harris, referred from Dr. Wooddell, went to Tidewater Neurologists, Inc. and Sleep Disorder Specialists for an EMG and Nerve Conduction Study. R. 408. Eric Goldberg, M.D. reviewed the electrophysiologic findings and concluded that there was evidence of "axonal motor and sensory polyneuropathy affecting both lower extremities. This is consistent with a history of diabetes." R. 408. On September 4, 2013, Ms. Harris' physician, Julian D. McKenney, PhD, D.O. ("Dr. McKenney"), provided a letter regarding Ms. Harris' condition. R. 410. The letter concluded that Ms. Harris' foot pain "greatly compromises her ability to work . . . she has great difficulty ambulating, climbing stairs, prolong standing, daily swelling with numbness and stinging." R. 410. Dr. McKenney opined, "Ms. Harris is unable to perform gainful employment at this time." R. 410.

Ms. Harris filed her initial claim for disability on August 3, 2011. R. 56. At the initial level of review, December 13, 2011, state agency physician Josephine Cader, M.D. ("Dr. Cader"), reviewed the evidence of record. R. 62-69. The allegation Ms. Harris presented was "[s]evere tendonitis in right foot." R. 62. Dr. Cader summarized Ms. Harris' abilities, stating,

"Ambulation tolerance has increased.  R [sic] foot ankle pain had decreased . . . claimant takes care of child, does house work with some assistance, but limits walking and standing.  Claimant limited to Medium Work." R. 65.

Dr. Cader then assessed Ms. Harris' RFC and found that she had some exertional limitations but that she could frequently lift and/or carry 25 pounds and occasionally lift and/or carry 50 pounds.  R. 66.  Further, Dr. Cader also found that Ms. Harris could stand and/or walk as well as sit for a total of six hours in an eight-hour workday.  R. 66.  Dr. Cader concluded that although Ms. Harris has some limitations in performing work-related activities, her condition is not severe enough to keep her from working.  R. 68.

On August 9, 2012, at the reconsideration level of review, Dr. Carolina Bacani-Longa, M.D. ("Dr. Bacani-Longa"), reviewed the evidence of record.  R. 72-82.  Dr. Bacani-Longa conducted a consultative examination of Ms. Harris, a RFC assessment, and an assessment of vocational factors.  R. 77-82.  Ms. Harris "brought a walker to the exam, but was able to do without it during the exam. She had a limping gait." R. 77.  In reviewing the medical records, Dr. Bacani-Longa found that Ms. Harris had medically determinable impairments: Disorders of Muscle, Ligament and Fascia; Dysfunction – Major Joints.  R. 77-78.  However, Dr. Bacani-Longa concurred with Dr. Cader's assessment and found "the alleged limitations are partially credible. [T]hough she is limited in lifting, standing, walking and stair climbing, it is not to the point she would be completely precluded from these activities." R. 78.  She found that Ms. Harris could frequently lift and/or carry 10 pounds and occasionally lift and/or carry 20 pounds, could stand for a total of four hours, and could sit for a total of about six hours.  R. 79.  Based on the assessment of vocational factors and using the applicable Medical-Vocational Guidelines would direct a finding of "not disabled." . . . Therefore, the individual can adjust to other work."

R. 80. Dr. Bacani-Longa ultimately concluded that Ms. Harris could perform "sedentary" work that "does not require heavy lifting or extensive walking." R. 81-82. Upon these reviews, the Social Security Administration notified Ms. Harris that her claims for DIB and SSI were not approved. R. 95, 100.

### III. ALJ's FINDINGS OF FACT AND CONCLUSIONS OF LAW

A sequential evaluation of a claimant's work and medical history is required in order to determine if the claimant is eligible for benefits. 20 C.F.R. §§ 404.1520, 416.920; *Mastro v. Apfel*, 270 F.3d 171, 177 (4th Cir. 2001). The ALJ conducts a five-step sequential analysis for the Acting Commissioner, and it is this process that the Court examines on judicial review to determine whether the correct legal standards were applied and whether the resulting final decision of the Acting Commissioner is supported by substantial evidence in the record. *Id.* The ALJ must determine if "(1) the claimant is engaged in substantial gainful activity; (2) the claimant has a severe impairment; (3) the impairment meets or equals an impairment included in the Administration's Official Listings of Impairments found at 20 C.F.R. Pt. 404, Subpt. P, App. 1; (4) the impairment prevents the claimant from performing past relevant work; and (5) the impairment prevents the claimant from having substantial gainful employment." *Strong v. Astrue*, No. 8:10-cv-357-CMC-JDA, 2011 WL 2938084, at *3 (D.S.C. June 27, 2011) (citing 20 C.F.R. §§ 404.1520, 416.920); *Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999) (noting that substantial gainful activity is "work activity performed for pay or profit."); *Underwood v. Ribicoff*, 298 F.2d 850, 851 (4th Cir. 1962) (noting that there are four elements of proof to make a finding of whether a claimant is able to engage in substantial gainful activity). "An affirmative answer to question one, or negative answers to questions two or four, result in a determination of no disability. Affirmative answers to questions three or five establish disability." *Jackson v.*

*Colvin*, No. 2:13cv357, 2014 WL 2859149, at *10 (E.D. Va. June 23, 2014) (citing 20 C.F.R. § 404.1520).

Under this five-step sequential analysis, the ALJ made the following findings of fact and conclusions of law. First, in determining whether Ms. Harris engaged in substantial gainful activity ("SGA"), the ALJ considered Ms. Harris' earnings record reflecting the claimant's income from her work activity as a full-time cook from September 2010 to May 2011. R. 14, 176, 186-187. Ms. Harris also testified that she averaged 25 to 30 hours of work a week and was paid minimum wage. R. 40-42, 17. The ALJ, concurring with the Social Security Office, found that Ms. Harris had not engaged in substantial gainful activity since the alleged onset date of March 1, 2008. R. 14.

Second, the ALJ found that Ms. Harris had severe impairments: right food disorder and obesity. R. 14. The ALJ also considered other impairments alleged by Ms. Harris, including diabetes mellitus and neuropathy. R. 15. The ALJ found the diabetes was not severe because it did not exist for a continuous period of twelve months, was responsive to medication, and did not result in any continuous functional limitations to perform work-related activities. R. 15. As for her alleged neuropathy, the ALJ did not find it to be a medically determinable impairment due to the absence of objective medical abnormalities and the presence of "documented objective medical findings in contradiction with this allegation." R. 15.

Third, the ALJ found that Ms. Harris did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. R. 15. Ms. Harris' impairments were considered under listing 1.02, major dysfunction of a joint. R. 15. The ALJ concluded that her "impairments do not result in the loss of the ability to ambulate effectively as evidenced by the claimant's ability to ambulate

11

with the use of a cane. Therefore, . . . [Ms. Harris'] impairments, even when considered in combination, do not rise to the level of severity required to satisfy the criteria of listing 1.02." R. 15.

Fourth, the ALJ found that Ms. Harris had the residual functional capacity ("RFC") to perform light work as defined in 20 C.F.R. §§ 404.1567(b) and 416.967(b), "except [Ms. Harris] can perform no more than two hours of standing or walking within an eight hour workday; [Ms. Harris] can perform no more than occasional postural activity; [Ms. Harris] cannot perform climbing; and . . . requires a cane for ambulation." R. 15-16.

Fifth, while Ms. Harris is unable to perform any past relevant work, the ALJ found that considering her age, education, work experience, and RFC, there are jobs that exist in significant numbers in the national economy that Ms. Harris could perform. R. 21-22. Further stated, the transferability of job skills was not a material determination in Ms. Harris' case because using the Medical-Vocational Rules as a framework indicates that Ms. Harris is not disabled and was not under a disability, as defined by the SSA, from March 1, 2008 until the ALJ's decision on August 14, 2013. R. 22-23. The ALJ asked the vocational expert to provide examples of light and unskilled jobs representative of those in which Ms. Harris could work. R. 22. The vocational expert provided the following examples, including ones that would fit the needs of someone that was further limited to only sedentary work: information clerk (152,000 positions nationally), office helper (275 positions nationally), order clerk (212,000 positions nationally), and office clerk (225,000 positions nationally). R. 22.

## IV. STANDARD OF REVIEW

Under the Social Security Act, the Court's review of the Acting Commissioner's final decision is limited to determining whether the Acting Commissioner's decision was supported by substantial evidence in the record and whether the correct legal standard was applied in evaluating the evidence. 42 U.S.C. § 405(g); *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (citing *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938))). While the standard is high, where the ALJ's determination is not supported by substantial evidence on the record, or where the ALJ has made an error of law, the district court must reverse the decision. *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987); *see also Strong*, 2011 WL 2938084, at *2 (requiring reversal if the decision fails to provide sufficient analysis to establish proper application of the law) (internal citations omitted).

In determining whether the Acting Commissioner's decision is supported by substantial evidence, the Court must examine the record as a whole, but it may not "undertake to re-weigh the conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the Secretary." *Mastro*, 270 F.3d at 176 (citing *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996)). The Acting Commissioner's findings as to any fact, if the findings are supported by substantial evidence, are conclusive and must be affirmed. *Perales*, 402 U.S. at 390. Moreover, the Acting Commissioner is charged with evaluating the medical evidence and assessing symptoms, signs, and medical findings to determine the functional capacity of the claimant. *Hays*, 907 F.2d at 1456–57. Overall, if the Acting Commissioner's resolution of the conflicts in the evidence is supported by substantial evidence, the Court is to affirm the Acting Commissioner's final decision. *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966); *Craig*,

76 F.3d at 585 (granting the Commissioner latitude in resolving inconsistencies in the evidence, which the Court reviews for clear error or lack of substantial evidence); *Vitek v. Finch*, 438 F.2d 1157, 1157 (4th Cir. 1971) ("[T]he traditional function of the courts in these cases is not to try them de novo, or resolve mere conflicts in the evidence.");

However, "[t]he court may remand a case to the Commissioner for a rehearing under sentence four . . . of 42 U.S.C. §405(g)" if the ALJ does not provide substantial support for his decision, or if the ALJ incorrectly applies the law. *Strong*, 2011 WL 2938084, at *2 (citing *Sargent v. Sullivan*, 941 F.2d 1207 (4th Cir. 1991) (unpublished table decision)); *Jackson v. Chater*, 99 F.3d 1086, 1090−91 (11th Cir. 1996)). "The [Commissioner] and the claimant may produce further evidence on remand." *Strong*, 2011 WL 2938084, at *2 (citing *Smith v. Heckler*, 782 F.2d 1176, 1182 (4th Cir. 1986)).

## V. ANALYSIS

Ms. Harris seeks judicial review of the Acting Commissioner's final decision. ECF No. 14. Essentially, she asserts that the ALJ erred in finding that she was not disabled because she has suffered from chronic pain in her right foot, diabetic neuropathy, plantar fasciitis, severe nerve damage that proceeded to her left foot, and "has tried everything possible to relieve [her] pain, from surgery to numerous pain med[icine]s, to physical therapy." *Id.* at 1-2. In her Motion for Summary Judgement, Ms. Harris also included new evidence regarding her alleged disability that was not presented to the ALJ before the hearing. *Id.* at attachs. 2, 3, 6, 7.

**a. The ALJ's decision that Ms. Harris is not disabled is substantially supported by the record.**

In her argument that she is disabled, Ms. Harris specifically disagreed with the ALJ's finding that she could work a sedentary "sit down" job. ECF No. 3 at 2. She argued in response,

"that is not true, due to [her] constant elevation throughout the day and having to circulate [her] feet] after sitting more than an hour." *Id.* Ms. Harris implies that the ALJ was incorrect in concluding that she does not have a disability based on the limitations caused by her impairments. *Id.* at 1-2; ECF No. 14.

In addressing her claim, the Court notes, "There is no rigid requirement that the ALJ specifically refer to every piece of evidence in his decision." *Reid v. Comm'r*, 769 F.3d 861, 865 (4th Cir. 2014). Here, the ALJ made his findings based on a "careful consideration of the entire case record," R. 15, "and, absent evidence to the contrary, we take [the ALJ] at h[is] word," *Reid*, 769 F.3d at 865. Again, it is not this Court's role to re-weigh the evidence, make credibility determinations, or substitute its judgment for that of the Commissioner, but rather, only to see if there is substantial evidence, "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 401. Here, the above cited record provides substantial evidence to support the ALJ's findings and conclusion that Ms. Harris is not disabled, and constitutes relevant evidence that a reasonable mind might accept the ALJ's conclusion as adequately supported.

The ALJ properly concluded that Ms. Harris' impairments, although severe, did not prevent her from performing limited light work with certain limitations. R. 29 (citing 20 C.F.R. § 404.1567(a)). Those limitations include: Ms. Harris can perform no more than two hours of standing or walking within an eight hour workday, she can perform the occasional postural activity, she cannot perform climbing, and she requires a cane for ambulation. R. 16. Though Ms. Harris disputes these findings, the ALJ's decision is supported by substantial evidence. In addressing her limitations, the regulations provide that the ALJ must determine a claimant's RFC. 20 C.F.R. § 404.1545(a). The RFC is a claimant's maximum ability to work despite her

limitations. *Id.* § 404.1545(a)(1). The determination of RFC is based on a consideration of all the relevant medical and other evidence in the record. 20 C.F.R. § 404.1545(a)(3). When determining Ms. Harris' RFC, the ALJ considered (1) the impairments as supported by the objective medical evidence and (2) the impairments based on Ms. Harris' subjective complaints. R. 16; *see also Craig*, 76 F.3d at 594. When considering Ms. Harris' subjective complaints and allegations of functional limitations, the ALJ must make a credibility assessment of the intensity of the symptoms to determine the true degree of limitation. *Id.*; *see also* 20 C.F.R. § 404.1529(a); SSR 96-7p. Under the *Craig* test, the ALJ must first determine whether there is an underlying medically-determinable physical or mental impairment that reasonably could produce the pain or symptoms. 76 F.3d at 592–94. If so, then the second step requires the ALJ to evaluate the claimant's statements about the intensity and persistence of the pain and the extent to which it affects or limits the ability to work. *Id.* at 595. Throughout the analysis, the ALJ must sufficiently explain the conclusions, including the weight assigned to the relevant evidence, so that a reviewing court can evaluate the basis for the final decision. *Ivey v. Barnhart*, 383 F. Supp. 2d 387, 389–90 (E.D.N.C. 2005) (citing *Arnold v. Secretary*, 567 F.2d 258, 259 (4th Cir. 1977)). However, "[b]ecause he had the opportunity to observe the demeanor and to determine the credibility of the claimant, the ALJ's observations concerning these questions are to be given great weight." *Shively v. Heckler*, 739 F.2d 987, 989–90 (4th Cir. 1984) (citing *Tyler v. Weinberger*, 409 F. Supp. 776 (E.D. Va. 1976)).

After considering the totality of the evidence in the record, the ALJ determined that Ms. Harris' "medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, [her] statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible." R. 20. In coming to his conclusion, the ALJ

"considered all symptoms and the extent to which th[ose] symptoms can reasonably be accepted as consistent with the objective medical evidence . . . [and] also considered opinion evidence." R. 16. The ALJ noted in regards to examining the evidence on record and Ms. Harris' subjective assertions that "the record contains a number of irreconcilable discrepancies. . . . Specifically, the undersigned finds the claimant's variable self-assessments of her functional ability to ambulate depending upon whom she is speaking with diminish credibility of the collective alleged symptoms and resulting limitations." R. 20.

Ms. Harris presented multiple limitations resulting from her right foot pain that allegedly conclude she has a disability. The ALJ thoroughly addressed each limitation Ms. Harris presented that she claimed results in her having a disability. *See Tackett*, 180 F.3d at 1099 ("If a claimant suffers from multiple impairments and none of them individually meets or equals a listed impairment, the collective symptoms, signs and laboratory findings of all of the claimant's impairments will be evaluated to determine whether they meet or equal the characteristics of any relevant listed impairment."). In regards to the walking or standing limitation Ms. Harris presented, the ALJ took into consideration her testimony that "she is unable to sit more than an hour, stand longer than 30 minutes, walk farther than a 100 [sic] feet, and lift more than 15 pounds. [Ms. Harris] also stated that she elevates her legs 30 minutes every 90 minutes during the day by sitting in a recliner." R. 16. The ALJ also noted Ms. Harris' testimony that since December 2012 she has used her cane both inside and outside her home. R. 16. However, the ALJ found that Ms. Harris' testimony regarding the use of a cane to ambulate was contradictory to her statements to her physical therapist. R. 20. The ALJ specifically noted that in May 2013, Ms. Harris stated in her initial physical therapy evaluation only using a cane upon first waking up in the morning and after prolonged sitting, and in fact, arrived at the appointment "without a

cane and wearing flat, unsupportive slip-on shoes." R. 19-20. The ALJ further considered Ms.
Harris' records, noting she had a 30% improvement in June 2013 after her second surgery and
"reported being able to ambulate without a cane for 30 minutes and stand for an hour." R. 19.
Lastly, in making his determination that Ms. Harris could perform light work or sedentary light
work, the ALJ considered the vocational expert's testimony regarding what types of jobs Ms.
Harris could perform based on her age, education, work experience, and RFC. R. 22. The
vocational expert provided a list of four general jobs representative of those in which Ms. Harris
could work with her stated limitation of being unable to walk or stand for any duration. *See
Tackett*, 180 F.3d at 1103 (explaining sedentary limitations: "[T]o be physically able to work the
full range of sedentary jobs, the worker must be able to sit through most or all of an eight hour
day").

In regards to her stated limitation that she needs to elevate her feet every 90 minutes, the
ALJ found "the absence of any mention of this limitation in [Ms. Harris'] medical records
surprising . . . because this is a significant problem and limitation." R. 21. In essence, the ALJ
did not find any assertion in her medical records—other than Ms. Harris' own statements—that
she needs to elevate her feet every 90 minutes. R. 21. In regards to her stated limitation that she
suffers from neuropathy of the right foot, the ALJ found such claim to not be supported by
medical records. R. 20. The ALJ stated, Ms. Harris' medical records are absent any detailed
mention of the diagnosis or the word "neuropathy" and, in fact, "the medical records actually
contain repeated objective findings showing [Ms. Harris'] sensation is intact and normal." R. 20.
The ALJ properly concluded that the absence of objective medical evidence in the record
addressing these claims makes Ms. Harris' statements less credible. *See Craig*, 76 F.3d at 591
("[S]ubjective claims of pain must be supported by objective medical evidence showing the

existence of a medical impairment which could reasonably be expected to produce the actual pain, in the amount and degree, alleged by the claimant."); *Tackett*, 180 F.3d at 1100 (noting that objective record evidence is necessary because "[a] generalized assertion of functional problems is not enough to establish a disability.").

In regards to her stated limitation that "she needs to sleep 4 hours out of every 8 hours during the day and suffers from poor sleep," the ALJ found these statements unpersuasive. R. 21. If a claimant asserts abnormal sleep patterns as an impairment, it is essential that the ALJ consider the effect of the sleep patterns on the claimants ability to work. *See e.g. Martin v. Apfel*, 118 F. Supp. 2d 9, 16 (D.D.C. 2000) (noting that "the ALJ did not properly consider or explain the effect of the combination of impairments or the consequences to [the claimant] of the sleep inducing medication she takes to control them"); *Pierce v. Astrue*, No. 1:07CV384, 2009 WL 1916967, at *4 (M.D.N.C. July 2, 2009) (holding that the ALJ erred in not considering the claimant's subjective complaints of poor sleep as a severe impairment when there was corroborating objective medical evidence indicating otherwise). After considering her testimony, the ALJ noted that it is reasonable and expected that Ms. Harris would have trouble sleeping at night if she is sleeping four hours during the day and "is able to readily fall asleep during the day while sitting in a recliner while taking Vicodin." R. 21. Further, the ALJ concluded that these sleeping limitations would not direct a finding of disability. R. 21; *see also Frost v. Barnhart*, 314 F.3d 359, 361-62 (9th Cir. 2002) (finding the claimant's assertions that he has to sleep until 2:00 PM every day because his "medication makes him drowsy" does not negate the conclusion that he can perform simple work).

Further addressing her credibility as to her stated limitations, the ALJ found Ms. Harris' testimony that she stopped working because her employer was not tolerant of her medical

appointments to be unpersuasive. R. 20. The ALJ noted that her "medical treatment is not what one would call exhaustive or rigorously frequent.   In fact, a number of missed medical appointments, due to transportation problems, punctuate [Ms. Harris'] medical records." R. 20; *Ledford v. Astrue*, No. 3:07-CV-1148-GRA, 2008 WL 4372778, at *8 (D.S.C. Sept. 18, 2008) (implying that the claimants subjective assertions of pain are less likely to be of disabling severity when the claimant himself failed to seek treatment for a period of time).

Further, the ALJ assured that even if Ms. Harris' past employer did not tolerate Ms. Harris' medical issues, 20 C.F.R. §§ 404.1566(c)(3) and 416.966(c)(3) expressly prohibit any finding of disability simply due to an intolerable employer. R. 20; 20 C.F.R. §§ 404.1566(c)(3) ("We will determine that you are not disabled if your residual functional capacity and vocational abilities make it possible for you to do work which exists in the national economy, but you remain unemployed because of . . . (3) The hiring practices of employers.").

In sum, the ALJ concluded that Ms. Harris' functional limitations are not consistent "depending upon the audience," because she appears to have a patchwork of claims that are threaded by a "fickle use of a cane, [her] relatively good physical examinations considering her impairments, and all medical source opinions within the record." R. 21. The ALJ clearly found, with substantial evidence, that Ms. Harris is not disabled under the SSA.

**b. Ms. Harris' newly presented evidence is not a proper consideration for this Court.**

In her Motion for Summary Judgment, Ms. Harris attached two identical letters from her primary care physician, Julian D. McKenney, PhD, D.O. ("Dr. McKenney"), dated September 4, 2013 and September 10, 2014. ECF No. 14 attachs. 1, 2. Dr. McKenney asserts, "It is her foot pain that greatly compromises her ability to work. . . . [S]he has great difficulty ambulating, climbing stairs, prolong standing, daily swelling with numbness and stinging." *Id.* He concludes

in each letter, "Ms. Harris is unable to perform gainful employment at this time." *Id.* In addition, she included a list of ten medications that she currently takes. *Id.* attach. 7. She also presented new evidence that she had surgery on her left foot. *Id.* Lastly, she presents objective medical evidence for the first time designating any issue of "neuropathy" by attaching a "Lower Extremities Impairment Questionnaire" filled out by Dr. Wooddell. *Id.* attach. 6 ("Chronic painful plantar fasciitis both feet combined and severe diabetic peripheral neuropathy."). Though this evidence may relate to her claim of disability, the Court cannot consider this newly presented evidence because neither the ALJ nor the Appeals Council were able to consider this information, and the Court's sole responsibility is to consider whether the ALJ's opinion is supported by substantial evidence. *Huckabee v. Richardson*, 468 F.2d 1380, 1381 (4th Cir. 1972) ("Reviewing courts are restricted to the administrative record in performing their limited function of determining whether the Secretary's decision is supported by substantial evidence."); *Domanski v. Celebrezze*, 323 F.2d 882, 885 (6th Cir. 1963) ("In reviewing this record the Court is not authorized to adopt findings of fact of his own, but must accept the Secretary's findings of fact if they are supported by substantial evidence. When so supported, they are conclusive.").

Further, most of the new evidence Ms. Harris presents post-dates the hearing with the ALJ, and therefore would not be admissible even if presented before the Appeals Council. "If new and material evidence is submitted, the Appeals Council shall consider the additional evidence only where it relates to the period on or before the date of the administrative law judge hearing decision." 20 C.F.R. § 404.970; *Meyer v. Astrue*, 662 F.3d 700, 705 (4th Cir. 2011) (explaining the role of the Appeals Council when new and material evidence is included); *Wilkins v. Sec'y, Dep't of Health & Human Servs.*, 953 F.2d 93, 95−96 (4th Cir. 1991) ("The Appeals Council must consider evidence submitted with the request for review in deciding

21

whether to grant review if the additional evidence is (a) new, (b) material, and (c) relates to the period on or before the date of the ALJ's decision.") (internal citations omitted).

Finally, the opinions rendered by Dr. McKenney that Ms. Harris is unable to work may not be considered as they impermissibly intrude on a question that is reserved for the Commissioner. *See Howard v. Astrue*, No. 3:09CV820, 2010 WL 3909901, at *4 (E.D. Va. June 25, 2010), *report and recommendation adopted*, No. 3:09-CV-820, 2010 WL 3909906 (E.D. Va. Sept. 24, 2010) (explaining that "when the physician opines on the issue of whether the claimant is disabled for purposes of employment" the ALJ is not required to accept that opinion because it is "an issue reserved for the Commissioner"); *Jarrells v. Barnhart*, No. 7:04–CV–411, 2005 WL 1000255, at *4 (W.D. Va. Apr. 26, 2005) ("[T]he ALJ is not required to accept the opinions of a treating physician when the physician opines on an issue reserved for the Commissioner."); *accord* 20 C.F.R. §§ 404.1527(d)(3)-(4), (e).

## VI. RECOMMENDATION

For these reasons, the undersigned **RECOMMENDS** that Ms. Harris' motion for summary judgment, ECF No. 14, be **DENIED**; the Defendant's motion for summary judgment, ECF No. 15, be **GRANTED**; and the final decision of the Acting Commissioner be **AFFIRMED**, and that this matter be **DISMISSED WITH PREJUDICE**.

## VII. REVIEW PROCEDURE

By receiving a copy of this Report and Recommendation, the parties are notified that:

1. Any party may serve on the other party and file with the Clerk of the Court specific written objections to the above findings and recommendations within fourteen days from the date this report and recommendation is mailed to the objecting party, *see* 28 U.S.C. § 636(b)(1)(C); FED. R. CIV. P. 72(b), computed pursuant to Federal Rule of Civil Procedure Rule 6(a). A party

may respond to another party's specific written objections within fourteen days after being served with a copy thereof. *See* 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 72(b).

2. The United States District Judge shall make a de novo determination of those portions of this report and recommendation or specified findings or recommendations to which objection is made. The parties are further notified that failure to file timely specific written objections to the above findings and recommendations will result in a waiver of the right to appeal from a judgment of this Court based on such findings and recommendations. *Thomas v. Arn*, 474 U.S. 140 (1985); *Carr v. Hutto*, 737 F.2d 433 (4th Cir. 1984); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).

The Clerk is **DIRECTED** to forward a copy of this report and recommendation to the *pro se* Plaintiff and counsel of record for the Defendant.

Lawrence R. Leonard
United States Magistrate Judge

Norfolk, Virginia
September 28, 2015

## CLERK'S MAILING CERTIFICATE

A copy of this Report and Recommendation was mailed on this date to the following:

**Dina Lynette Harris**
901 Railroad Avenue
Franklin, VA 23851
(757) 284-1296
*Pro se*

**Gregory David Stefan**
United States Attorney's Office
101 W Main St
Suite 8000
Norfolk, VA 23510
(757) 441-6331
Email: greg.stefan@usdoj.gov
Counsel for the Defendant

Fernando Galindo
Clerk of the Court

By: _____/s/_____
    Deputy Clerk
    Date:  9/29/2015